Thank you, Your Honors. My name is Shelley Hammack, and I'm here on behalf of Appellant Joseph Daniels. Mr. Daniels is also present. I'd like to reserve five minutes for rebuttal. This case involves claims of discrimination, including hostile work environment, discrete acts of discrimination, retaliation, and negligent supervision. Mr. Daniels was employed by America West in September of 1998, and I'll just summarize briefly the facts. During the course of his employment, he was subjected to ongoing harassment and discrimination, including being subjected to comments, derogatory comments. He had a very threatening and offensive photograph put in his locker. He was routinely assigned jobs that were disfavored. He, along with other minorities, were, as a form of punishment, forced to stand in the rain by a supervisor, Mr. Peterson. And during the course of his employment, Mr. Daniels was supervised by a number of individuals, but his primary supervisor was Mr. Peterson. The court, the trial court, dismissed plaintiff's claims on summary judgment, finding that plaintiff had not presented sufficient evidence to establish a hostile work environment or discrete acts of discrimination and retaliation, and also dismissing the negligent supervision claim primarily based on plaintiff's failure to establish discrimination. In its decision, the court relied, and the parties cited, case law relating to the continuing violation doctrine in argument in support of the hostile work environment claim. After the ruling by the district court in that, and prior to submission of the briefs on appeal, Washington State law changed. And Washington adopted the Federal rules relating to that issue. They rejected the continuing violation doctrine under Milligan and adopted the Morgan doctrine. To establish a hostile work environment claim, plaintiff must show that the harassment was unwelcome, was because of his race, affected the terms and conditions of his employment, is imputable to the employer. Plaintiff appellant had been subjected to ongoing acts of harassment and discrimination. The acts which occurred within the statutory time period are the fight with Peterson, the suspension, and the discharge. Yes. And again, you know, I'll just point out to the court that the argument and the assault by Mr. Peterson related to a job assignment. Yes. Plaintiff or appellant was assigned a backdrop, which is one of the job assignments that he's indicated, always indicated was disfavorable because it's open. And was that argument about the disfavored position made in the district court? Yes, it was, Your Honor. And maybe I'm not, what do you mean, disfavored position? Well, I mean, we're talking about, are you talking now about what led to the altercation, which was on, was that the June 8th? Yes. It was the June 8th altercation. And there are many things that led up to that, and I think there were several arguments made, but that was one of them. The fact that my client had switched jobs, which was routinely done, the employees there did that, they did it for sake of efficiency. He switched jobs with a Caucasian female. He was the only one approached by Mr. Peterson. She never was. There's no evidence that she was ever approached, period, ever, about the reasons for switching a job. But there was that. And the other facts leading up to it as well were that on May 18th, the prior month, my client filed a claim with the EEOC for discrimination. That claim was received by the Human Resources Department at America West the end of May. They were supposed to file, initially supposed to file a response with the EEOC, I believe, on June 9th. It was their claim that they didn't notify SeaTac Airport, didn't get a hold of them. But I think the timing in that is at issue. One thing kind of goes to the nut of your claim is whether there's evidence of a racial motivation for this altercation that came up. And it seemed to me that there wasn't any evidence on the record. Your client said, as Mr. Peterson was a hothead, which apparently he was for what he did, and that it wasn't that his hotheadedness wasn't motivated by race. So what is the race-based aspect of that June 8th occurrence? Under a hostile work environment claim and under any discrimination claim, the Court is entitled to look at past conduct and conduct that directly relates to discrimination. Mr. Peterson had admitted to my client previously that he was uncomfortable with African-Americans. He had treated my client differently during the course of his employment. And again, Ms. Yarborough wasn't approached by Mr. Peterson. She's Caucasian. And she indicated during her testimony, although she couldn't explain why, that she believed Mr. Peterson's conduct was racially motivated. And again, that was a current – Ms. Yarborough was a current employee of America West. So in discrimination being what it is, it's often difficult for people to be able to articulate why they think that racial discrimination is occurring. But I think her testimony is important. And the pattern, the clear pattern on the part of Mr. Peterson and his prior conduct can be used to show his racial animus and discriminatory intent, along with the disparate treatment that my client received in relation to that, I think goes with that. And I think it's important when you're arguing to remember when you're arguing a hostile work environment, what you're arguing is an ongoing pattern. It's not one discrete act. It's an ongoing pattern of discrimination and hostility that's endured by the plaintiff or claimant. And in this case, there was a pattern of discrimination by Mr. Peterson. And especially for purposes of summary judgment, when all facts are supposed to be construed in the light most favorable to the nonmoving party, I think my client has presented sufficient evidence of that. Anyway, I think that's in the record. And that's – that goes to the heart of his hostile work environment claim. Defendant has made an argument that the claims aren't imputable to the employer. And admittedly, Washington law relating to imputation has been rather convoluted. But I think the most relevant case that should be applied in this case is Burlington. And under that, a supervisor with immediate authority over an employee is sufficient to establish imputation. In this case, Mr. Peterson had responsibility for job assignments. He clearly held the power relating to whether or not an employee would get a promotion to loadmaster. It was his decision as to whether or not an employee went to that school. He was the primary individual, and the supervisors were on site. There were some issues with lack of management at CTAC. And there was no real upper management at CTAC. They were pretty much absent most of the time. So the supervisors had the primary duties, the duties of job assignments and everything else. So I think under Burlington, and under any rule the Court adopts, even in the negligence standard for imputation, that we should survive summary judgment in this case. What was the evidence that suggested that Peterson's motivation was racial? As I understand the proceedings in the district court, the client suggested that the motivation was retaliation for the EEOC, filing of the EEOC claim. In part, but it's also our contention that it was part of an ongoing act of discrimination in relation to the hostile work environment. We've made both of the arguments that it was in retaliation for that, but it's also part of the ongoing act in hostile work environment. What suggested that the – is it the work assignment, the fight? What was – Well, it's rather the entire thing, I think. It was the work assignment, his ongoing pattern. What in the district court was said that suggested that the work assignment was not just an ordinary work assignment, that it was somehow discriminatory? Well, we have always argued that Mr. Peterson gave unfavorable work assignments to my client based on his race. Was there testimony to that effect? From my client, yes. And he – my client did. You testified in the district court that this was a bad assignment? It was not like – it was a less desirable assignment? Absolutely. In addition to that, when he was given this type of assignment, he would frequently be told that I'm not assigning this to you because you're black. You know, I'm not giving this work to you because you're black. So it was in addition to the fact that, you know, it's unfavorable, and he was continually told by that – told that by his supervisor that led him to believe he was, in fact, being given these work assignments because of his race. I think that – Can I go back to something you said before? Maybe I just misheard it, but on the EEOC claimant and the altercation, I thought the evidence – the only evidence in the record seems to be Mr. Peterson didn't know about the EEOC claim. Is there something that you point to that suggests he did know? I think – and this is – I think this goes in large part to the retaliation claimant. The timing of when they received the complaint and the events that occurred, I think, are sufficient to establish that, or at least circumstantial evidence that support the conclusion that he had knowledge. He filed my – But is that enough? I mean, you say it in your brief, and then we have undisputed deposition testimony that he didn't know. We don't even have anything that would suggest, given the sort of structure of the company, that it's the kind of thing that he must have known or he reasonably would have known. So I was just looking to see if there was any evidence to connect him up with the knowledge. There is testimony that Ms. Califf with Human Resources, the Human Resources Department, received the notice, and it's stamped on there. She indicated that she took it to legal, and I believe she also said it was her responsibility or their department's responsibility to assist in doing the investigative part of it. But all of that is kind of going on up here in the corporate world, and we're looking around. So what's between here and there? I mean, is there any evidence that we should look at? Well, there – you know, it's difficult, especially when they're contending that they didn't say anything. And it's an issue of credibility in large part, whether or not she did and how far they took it, because it's Ms. Califf's testimony that she didn't, but they were required initially to file a response, I believe, by June 9th. So it just – that doesn't make sense that they wouldn't know, at least that they wouldn't have contacted them to start to get information. In addition to that, and again, we're talking more about, I think, the retaliation claim, Ms. Califf's testimony was inconsistent. She had indicated that when my client finally got a hold of her and contacted her regarding a return to work, that he never said anything about not receiving the letter that – the termination letter that they had sent out. And then later in a declaration, I believe she acknowledges that she was aware of that and had a discussion with Mr. Pepper about it, and they had made the determination that my client wasn't credible. So there's some conflicting testimony from her that I think creates an issue of her credibility. But in addition to that, I'll just point out in Bell, in that case, the court found that timing is strong evidence of retaliation, and again, that goes to the retaliation claim, but I think it also goes to and can be used in arguing that Mr. Peterson had knowledge or likely had knowledge. And again, you know, I want to point out that this is summary judgment, so issues of credibility should be weighed in our favor and my client's favor. But going back under Morgan and the differences, there's a significant difference between Milligan and Morgan. And what the court found under Milligan, he primarily relied on the first and third elements of Milligan, and the third one being that the series or the hostile work environment claimed that the party didn't have knowledge prior to actually taking action that a claim existed. And that's been completely rejected by the court now. In addition, under the first one, he had to show a substantial relationship between the acts. Under Morgan, all you have to show is some relationship between the acts, so it's much less stringent of a standard. In considering Morgan, what the court is to consider is whether the incidents involved the same type of actions, occurred relatively frequently, and were perpetrated by the same managers and supervisors in this case. And I think my client has submitted evidence that they were, in particular, by Mr. Peterson. So in relation to the hostile work environment claim, I believe that there's sufficient evidence for my client to be a part of the trial. In addition to that, under the discrete acts of discrimination, my client's required to show that he's a member of protected class, that he was treated less favorably in terms and conditions of his employment than a similarly situated employee that's not a member of the class. And he and the unprotected employee were doing the same work. In the alternative, he can show that the different treatment was based upon his race, in this case that there's no issue as to the first element. In his termination, his suspension and termination, I think Mr. Peterson is a good comparator. If anything else, his conduct was more egregious. And the problem there, though, is that Mr. Peterson came back to work, and the ultimate termination decision appeared to turn on the failure to return to work. At that point, these two individuals are no longer comparable. Yes. And again, that issue goes to credibility. I mean, whether or not he was actually terminated just for his failure to return to work, I believe is an issue of fact that is that should be determined by a jury. That's the defendant's claim. But I think there's evidence that supports a contrary conclusion. And because there's evidence to that, that it's an issue for the jury. And again, timing in and of itself is strong evidence. Is there any evidence that termination is connected to something else other than the inferences that you pulled out before supporting your claim for hostile work environment, for example? And what I'm getting to here is, isn't the termination decision made by somebody out of the circle that's responsible for the hostile work environment? Well, the decision was made by Ms. Califf and I believe Mr. Pepper together. And it's defendant's contention that Mr. Pepper was, and he, I believe he started his employment in May. So it was right before the incident in June. And he was at, it's my understanding, the SeaTac Airport. So he was there. So there's that connection. It was made together. In addition to the timing, I think that the fact that they had a policy or procedure of sending out letters, and they knew that my client didn't receive the letter because it went to the wrong address. When did they know that? Well, at the very latest, they knew when my client called them. He indicated during a telephone call to a supervisor that told him that he needed to call the office that, I mean, he was calling back this supervisor. And he's the one that told him he had been terminated, he needed to call Human Resources. So I even think there's an argument before then that they probably had the heads up that he never received a letter because he didn't know he was terminated. But even after they knew and they had a policy of sending a letter out, you know, at the very least, they should have followed their policy and ensured that the letter was sent out to the correct address. If it hadn't been, they should have resent it, which would have allowed my client. I agree with everything you say as to what they should have done and what would be logical. Is the fact that they didn't do that enough to support a claim that their failure to do that was motivated by racial animus? I think that, along with the other evidence, and I've gone over. Other evidence is sufficient. The timing, Ms. Califf's inconsistent testimony, the other circumstances, their failure to follow their own policy, is all circumstantial evidence, I think, that supports my client's claim, and I believe it's sufficient in this case. Thank you. Thank you, counsel. We'll give you two minutes for rebuttal. Okay. Thank you. Good morning, Your Honors. May it please the Court. My name is Mary Riley, and I represent America West Airlines. First, I'd like to address a couple of the points that counsel just made in our opening remarks. There was no argument in the district court below that the trading, that the job assignment that Mr. Peters, that Mr. Daniels ended up exchanging with Cindy Yarborough was an unfavorable assignment. That is a brand-new argument that has only come up on appeal. I would also note that there's absolutely not a single piece of evidence in the record below to suggest that, in fact, that assignment, a regular assignment of a regular standard job duty, was, in fact, unfavorable. In fact, it's quite clear that, to advance his claim here, Mr. Daniels labels conduct that is routine and ordinary, unfavorable, disagreeable, and he doesn't like it, and then says, because I'm African-American, it therefore must be discriminatory. That's not racial conduct. Let me point the Court to Mr. Daniels' own statements, own statement contemporaneous with the events of June 8th. On page 516 of the record, Mr. Daniels is asked to submit a statement to his manager about what happened that day. He goes on to state, on the evening of June 8th, 2000, the ship's supervisor, Jeff Peterson, approached me and asked if I had completed the bag drop for Continental Flight 661. I told him I had not, as I had worked the aft bin on that flight. Cindy Yarborough had volunteered to do the drop. Jeff yelled that he wanted to talk to me, talk with me, and I asked him what for. As was developed in the record below in great detail, and as the district court correctly found, the issue and what prompted the altercation was clearly Mr. Daniels' refusal to meet with his supervisor then and there as requested. There's no evidence in the contemporaneous statement of the events, there's no evidence in Mr. Daniels' testimony, that the volunteering by Ms. Yarborough to take over the bag drop was the transfer of an unfavorable or impermissible assignment based on rights. From there, the whole incident occurs, as the district court correctly noted, because Mr. Peterson got angry over the fact that Mr. Daniels refused to meet him. That is the reason that the altercation occurred. That is the reason why he, in turn, acted inappropriately. There is absolutely nothing in the record below, and the district court correctly found, that none of the events of June 8th give rise to any inference whatsoever that race was a motivating factor in the decision. Certainly, it wasn't a motivating factor in his losing his temper and yelling at him, and there is nothing in the record below to suggest that it is. Let me turn now to Mr. Peterson.    I'd like to ask a question about the possibility of quarreling. And if you go back farther in time, you can find some, or at least the allegations of a racial connection, statements attributed to Mr. Peterson, specifically putting race into the picture. All right. Is the Court precluded, or is plaintiff precluded from arguing or trying to make the racial connection for the subsequent episode by pointing to what happened before? Based on the facts here, yes, Your Honor, and let me explain why. Here, the only specific discriminatory remark that Mr. Daniels ever alleges that Mr. Peterson made was shortly after Mr. Peterson arrived on site, saying that he was uncomfortable with blacks. That's the only specific, directly racial remark. And when you read Mr. Daniels' own testimony, he puts it into context. He says, I never had much experience Mr. Peterson told him that he never had much exposure to African Americans, hence the remark. The only other Is it Mr. Peterson to whom Mr. Daniels showed the picture? No, sir. The testimony and the record below indicates that the lynching picture that you're referring to, Your Honor, was shown to the other supervisor, Chad Dumlau. But back to the point of a moment ago, Your Honor, there isn't this pattern of either aggression by Mr. Peterson towards Mr. Daniels, nor is there a pattern of racial type of conduct. The only thing that Mr. Daniels can point to is this, again, the unfavorable assignment, which, as the record makes clear and was developed in the record below, these assignments that he protests are, in fact, the heart of his job as a ramp agent. You know, there's no dispute that part of the ramp agent's job includes less desirable tasks as opposed to more desirable tasks. Mr. Daniels makes it abundantly clear that he would prefer to be the one marshaling the planes, standing out there with the directionals and guiding in the planes. But there's also no dispute that servicing the lavatories and lifting heavy bags are part of the job. The mere fact that he had to do that, along with everyone else, doesn't make it discriminatory. And he's going to do it more frequently than others. All he offers is his speculation and opinion that that is the case. He offers not a single piece of evidence that demonstrates that that, in fact, is true. And, in fact, the only other person who testifies on this point, on whom Mr. Daniels relies extensively, Ms. Yorberow, says that Mr. Peterson did not single out African-Americans, as best she could tell, notwithstanding her statement to the EEOC investigator that she thought the June 8th incident might be racial, although she couldn't understand, she herself couldn't articulate the reason why she thought it was racial. So there's nothing here to suggest that there was a pattern of conduct in which Mr. Peterson was acting in a racial fashion. And the only other comment that plaintiff ---- Kennedy, in his testimony, that he was generally given the least favorable assignments, why doesn't that raise a question of fact as to whether there was a pattern of giving him unfavorable assignments? It doesn't raise a question of fact, Your Honor, for two reasons. First, it would only go to the issue of the hostile work environment claim. And we haven't talked yet about the discrete acts. But for a moment, it certainly isn't relevant to the discrete acts. But on the issue of the hostile work environment, there's no evidence before the Court. What the courts have consistently held, and what this Court has consistently held, is that there has to be evidence beyond just mere opinion testimony that I didn't like this task, therefore it's unfavorable, and therefore it's racial. That's just simply not enough to meet the threshold. That's all Mr. Peterson ---- excuse me. That's all Mr. Daniels offers here in this case. And on the hostile work environment claim ---- Well, you yourself say there are some more desirable tasks and some less desirable tasks. That's probably not a matter of any dispute. The question is, the fact is, if Mr. Peterson says I regularly was given the less desirable tasks, why doesn't that raise a question of fact? That's ---- Well, it would only raise a question of fact. First of all, all of those incidents predate the statute of limitations, Your Honor. So ---- Yeah, unless this last one constitutes a part of that pattern. But that last incident doesn't involve an unfavorable assignment. There's absolutely nothing in the record whatsoever to suggest that. I mean, that's, I guess, my question to counsel. I just want to clarify. Sure. This is the bag drop issue, the Continental Bag Drop. And I think your position is that there's no testimony in the record that one or the other of these was the more or less favorable job, the ones that were flipped. That's correct. But counsel says, no, he complained about less favorable assignments. So I guess we'll just have to see. You're saying he never complained about it as to this incident. That is correct, Your Honor. He never complained about it with respect to this incident. And his contemporaneous description of the event doesn't even suggest that it was either an unfavorable assignment. And in fact, what he says is Yarborough volunteered to take the job off of his hands. And again, Your Honor, back to your point, though, about all of us have tasks in our jobs that are less favorable and less desirable. The mere fact that you happened to be assigned it doesn't mean that you suffered some of the consequences. Well, if you were given all the undesirable cases in your office, you would be able to figure that out, I assume. Indeed, Your Honor. And there are better and worse cases to have. Indeed, Your Honor. But in order to overcome summary judgment, I have to offer more than simply my opinion that that's all I got. In fact, the case of the case of the case, you know, there's flagging the airplanes down, there's cleaning the bathrooms, that sort of thing. If he said, you know, the job is lots of these things, but I only get to clean the bathrooms, wouldn't that be enough to overcome summary judgment? Under the facts that you've presented, that would certainly be a more compelling case. But what Mr. Daniels does here, he basically says that everything is unfavorable except being the head guy marshaling the planes. So now what he's done is basically taken his entire job and forced it down to the only thing I really wanted to do was this one small piece. It would be like saying the only part of my job that I want to do is argue in front of the Ninth Circuit. There are a lot of other things that I do that aren't particularly desirable or favorable, but nonetheless, it's part of my job. But even if we were to say, Your Honor, that that was enough, the hook here is that the events of June 8th really don't provide the connection that Plaintiff needs for his hostile work environment claim. But even if they did, even if he met the prima facie threshold, that's only the first step of the analysis. The second one we leave that. Yes. You say that at the summary judgment motion, there was no reference to the fact that this was an undesirable job, and there was no complaint about the job assignment at the time of summary judgment. That is correct, Your Honor. What Plaintiff argued below was that Mr. Peterson had acted inappropriately by asking Joe Daniels to speak with him and not asking Cindy Yarbrough to speak with him, but not about the favorableness, if I could call it that, with respect to the assignment of the drop in the first instance. Even if Mr. Daniels were able to establish that this event of June 8th was the hook necessary to make the untimely acts timely, that doesn't end the analysis on the hostile work environment claim. He must also establish that the conduct can be imputed to America West. And as we noted in our brief, there is certainly under Washington law some state of flux in terms of the analysis. But under any version of the analysis, we don't believe that Mr. Peterson rises to the level either of the manager status necessary to hold him, to hold America West automatically liable for his actions. And certainly there is no evidence that America West knew or should have known of Mr. Peterson's conduct and failed to take prompt corrective action. In fact, the record is devoid of any evidence whatsoever that higher-level management at the facility, at CTEC, or in Phoenix, in Human Resources, knew anything at all about Mr. Peterson's purported conduct. The record is quite clear, and Mr. Daniels himself admits repeatedly in his testimony that he never complained to anyone in higher management about Mr. Peterson's conduct. Given that, and given the fact that Mr. Peterson is at best a low-level supervisor --" Bless you, Your Honor. --"a low-level supervisor who cannot control Mr. Daniels' destiny, he doesn't rise to the level of a manager under which automatic imputation is possible, whether we're analyzing the issue under the Glasgow case or under the other cases. In addition, as the district court correctly found, even if the court were to assume that Mr. Peterson's conduct on June 8th was motivated by racial animus, it is absolutely undisputed that when presented with information about Mr. Peterson's conduct that day, Mr. Booth investigated the allegations and took prompt and effective disciplinary action. He immediately suspended him for five days, issued him a corrective, and issued him a corrective action warning. So there's no argument here that the company, when finally apprised of conduct that could even remotely be considered racial, that it did not take prompt corrective action. That seals plaintiff's fate or appellant's fate on the actual action taken. What was the reason for the action taken against Mr. Peterson? Well, at the time, they didn't know it was racial, Your Honor. I concede that. But to the extent Mr. Daniels now says, well, you should have known it was racial, all's we can say is when apprised of the events, we acted as vigorously as we could. Certainly, had we known at the time that the – Well, if it were racial, you didn't act as vigorously as you could because you gave him the same penalty you gave to the plaintiff. Not knowing at the time it was racial. I'm only saying in hindsight, Your Honor, we – that's what we did. You can't get credit for disciplining him for a racial incident because you didn't. And you still don't think it was a racial incident. That's true, Your Honor. I'll concede that. Corrective action. But when presented with a specific event that plaintiff finally now brought to the attention of management, saying it was inappropriate, there was prompt action. And that's the point of the argument, Your Honor. It's a little out of your flow, but let me put to you the factual element that does relate to management that's puzzled me, and that's the termination decision and the apparent decision to sustain the termination even once the company realized that it sent the letter to the wrong place. How come? That seems a little strange. Well, in hindsight, and with the benefit of sitting here with all the papers in front of us, Your Honor, I couldn't agree more. But that's not the legal standard. The standard is whether or not at the time they had a bona fide belief that Mr. Daniels had in fact abandoned his job. And at the time, there was ample evidence to suggest that he had. Well, if you find out two weeks later that Mr. Daniels never knew that he was entitled to come back, then what? Well, they did find out a few weeks later that he didn't get the letter. But they're not obliged at that point to basically, in effect, overturn their prior decision. The termination decision had already been made without the benefit of knowing that Mr. Daniels didn't get the letter and didn't know. In fact, the record is quite clear that corporate personnel aren't aware of the details of him not getting the letter until after the decision is made or of his call to human resources doesn't occur until July. They're under no obligation to overturn the decision. Reasonable people could disagree and say they should have. It would have been prudent to. But there were other indications to them that suggested that he wasn't interested in coming back. The fact that he had not called, despite participating in the investigation, going back into the facility to return his badges, to submit a statement. He claims he had originally called and was told that Mr. Booth was out. And then after repeated messages are left for him, he goes two and a half weeks before he calls anybody again. In addition, based on the events at the time, there was no obligation to send a second letter, if they certainly could have, but there was no obligation to do so. And one of the overarching issues that appellant has dropped on appeal was, at the time, he had he was part of a collective bargaining agreement. He had a union. He could have grieved the suspension, he could have grieved the termination, and he could have protested. He had a mechanism by which he could have pursued that. And contrary to the assertions in the brief, in the reply brief made here, the district court was absolutely clear that there was ample evidence that as of June 12, 2000, Mr. Daniels was part of a collective bargaining agreement. He was covered under the TWU contract. So he had remedies that he could pursue. So the company was influenced at the time that it appeared from all other evidence that he didn't sincerely have any longer an interest in pursuing his job. And the standard here isn't whether or not they were right. The standard here isn't whether or not they should have done something different. The standard is whether or not they were truly motivated by the stated reasons. The evidence is clear that they were. They sincerely believed at the time that he did not want to come back to work. They may have been wrong, but that doesn't make it racial. Let me turn for a moment to the issue of the discrete acts. There's absolutely nothing in the record to point out that either the decision to suspend or that the termination decision itself were motivated by racial animus, and Plaintiff offers no evidence to prove that those stated reasons were a pretext for discrimination. I'd also like to briefly touch on the retaliation issue. The record does not indicate whatso – in any way whatsoever that Mr. Peterson knew of the filing of the EEOC charge. As Judge McKeon noted earlier, the testimony by Mr. Peterson and by Ms. Califf on this point is unequivocal. She didn't tell Mr. Peterson, and Mr. Peterson testified that he had no idea of the charge while he was still employed at America West. So there's nothing in the record whatsoever to create this inference that Mr. Peterson knew and that that was a motivating factor for purposes of the events of June 8th. It's also undisputed that Mr. Peterson had no input into the suspension or termination decisions. As for the knowledge of Mr. Booth and Mr. Pepper, who are actually the decision makers with Ms. Califf's guidance, she's not a decision maker. It's Mr. Booth who recommends to Mr. Pepper that the – what the action should be, and it's Mr. Pepper who accepts that recommendation. At the district court and here on appeal, we basically, for the sake of argument, conceded the prima facie case. What we then present to the court is that there's still no evidence to suggest that the decisions to either suspend or terminate were motivated by the existence of the EEOC charge. Plaintiffs' or Mr. Daniels' arguments on that are nothing more than speculation and opinion, and that's not sufficient on summary judgment to overturn – to defeat the motion for summary judgment. Unless the Court has any further questions, I will submit. Thank you, counsel. Thank you, Your Honors. Thank you, Your Honor. I just want to point out, too, that opposing counsel has indicated that the only racial remark made by Mr. Peterson was that he felt uncomfortable with African Americans. That's not the case. The appellant has, and it's clearly in the record, continually testified that when the job assignments were given to him by Mr. Dumlau and Mr. Peterson, that they were given to him with comments that, I'm not giving you this assignment because you're black. So there were other comments made, including that comment, which I think is very important in this case. In addition to that, my client in the record has clearly stated that assignment of the bag drops is the least favorable position to hold, and he describes why, because you're subjected to the elements, you're out in the open. I thought that was on the mail truck that he said that that was you're out in the open and it was raining. It's the mail trucks were uncovered. It says mail deliveries were generally disfavored, because mail trucks were uncovered and it rains frequently. Okay. I believe that's the same as the bag drop, I think. The same as the bag? I believe so. Similar. Similar. Okay. Maybe I'm mistaken in that. But anyway, there were comments made when the assignments were given, so it's not that there were one single comment by Mr. Peterson. Now, at the summary judgment hearing, did you in your summary judgment papers or an argument talk about the fact that the job assignment on that day of the dispute that Linda just mentioned, that that was an unfavorable job assignment? Yes. I believe so. I firmly believe so. It was an argument made by my client all along. But I mean, here's the difficulty is that they say it's not that in the briefs they say it's not, the district court didn't deal with that. So I'm trying to go back to the record, but do you think we would find it in Mr. Daniel's affidavit or where would we look to find that? I believe it's in our summary judgment response, probably under the facts, and I believe it was raised at oral argument. So I believe it would be in the hearing on the transcript on the hearing. And if the Court would like, I can go back and relook at that and submit something to Court later as a supplement as well. I'll add a little bit of time. There's a citation to the record in your brief after you described this as an unfavorable job assignment. The reference is to the appears to be a deposition testimony of Mr. Daniels. In the context of the retaliation claim, and the sense I get from reading the few lines is that he's identifying this as something saddled on him because of this retaliation claim, but there is there some inference that the reason he's complaining about or the reason I think he's been singled out or the manner of singling out is that Joe will do the bag drops because he can be punished in some fashion by that. I don't even know what a bag drop is, so maybe I should ask you what is a bag drop? A bag drop is when you take the bag off and put it in your bag. Okay. Okay. But I think it's in the record, and like I said, I'll supplement if the Court would like. See, it's not just a question of whether your client said that sometime in the deposition. The question of whether at the time of summary judgment the Court was told that this is an unfavorable assignment and he was given it because of his race. That's what we need to find, whether that issue was raised to the district court at summary judgment. I can tell you with absolute certainty that my clients always made that allegation, and that allegation was before the Court, that I believe in the facts that indicated that the job assignment that Mr. Daniels was assigned to was a bag drop and that Ms. Yarborough agreed to take that. So with absolute certainty, I believe I can tell you that. Well, how about we do this, because you need to find it in the record. The clerk has these little pieces of paper for supplementing citations or whatever, and I don't know if you can do it today. You may not have brought all your appropriate records, but you may not be able to do it right here, but to fill one of those out and give it to the clerk and copy to counsel. So with just simply the transcript citation or the leading reference. Sure. Okay. Or you can, if it takes you a day or two and you can't do it now, you can send us a letter that just gives us the pages. Okay. Where to look in the record that would raise whether this question was raised to the district court. Okay. Thanks, Your Honor. And just quickly, I just want to hit real quickly a few points that, again, the union agreement wasn't ratified until June 12th. My client was not there on June 12th and never came back to work. Mr. Peterson indicated there was no indication of a union or union activity when he left in July. When there was no union, this was the first time the union was there? Yeah. They had just gone through, I guess, votes and things like that. But it wasn't actually ratified and nothing was in place. I mean, the contract wasn't even signed until after my client. I mean, was this a first-time contract? Yes, I believe so. Yes. You're saying it was signed in June, June 12th? June 12th is when it was ratified. But this incident was on June 8th, correct? Yes. Yeah. And it was the last day my client was at work. So saying that he had access to a union is really nice, but in practical matters, my client didn't know he had access. And even if he knew that it was ratified, it was new. I'm sorry. I mean, he was still employed there, correct? Yes. Yes. And that's not a primary issue. I think it's just one of the factors they were arguing in relation to the retaliation and imputation. But, and again, I believe that Mr. Peterson was treated differently than my client. He was allowed to remain at work, and he continued to work for several days. He was put on suspension for a limited period of time, which my client wasn't. He was allowed to return to work, but my client never was. We're five minutes over now, so I think. Thank you very much. Thank you. All right. Both. Thank you both. The case disargued will be submitted.
judges: Reinhardt, McKeown, Clifton